# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕱𝖊𝖉𝖊𝖗𝖆𝖑 𝕮𝖑𝖆𝖎𝖒𝖘

No. 24-1001

Filed: March 31, 2025

Re-issued: April 8, 2025[1]

| | |
|---|---|
| | ) |
| LOYAL SOURCE GOVERNMENT SERVICES, LLC, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| *Defendant*. | ) |
| | ) |

*Samuel Knowles*, DLA Piper LLP (US), Washington, D.C., for Plaintiff Loyal Source Government Services, LLC. *Thomas E. Daley* and *David R. Lacker*, *of counsel*.

*Galina I. Fomenkova*, Senior Trial Counsel, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia McCarthy*, Director, *Douglas K. Mickle*, Assistant Director, *Roger A. Hipp* and *Pavan Mehrotra*, Department of Homeland Security, *of counsel*.

## <u>OPINION AND ORDER</u>

**MEYERS, Judge**.

To protect the integrity of federal procurements, Congress prohibits the disclosure of certain procurement information during the pendency of the procurement to which it relates. Unfortunately, prohibited disclosures still happen in a small number of cases. This is one of those cases. In such cases, Congress requires the procuring agency to reasonably investigate any alleged disclosure and reasonably ensure that there is no ongoing harm to the procurement because of the disclosure. Because the procurement officials in this case acted reasonably and effectively mitigated the harm of the unlawful disclosure, the court denies Plaintiff's motion for judgment on the administrative record and to enjoin the procurement and order additional relief, and grants the Government's cross-motion for judgment on the administrative record.

---

[1] The court initially filed this Opinion and Order under seal to allow the parties to propose redactions. The parties submitted their proposed redactions, ECF No. 49, and the court has incorporated those proposed redactions and makes them with bracketed asterisks ("[ * * * ]") below.

# I.    Background

## A.    Medical Services at the Southern Border

Within the Department of Homeland Security ("DHS") lies the Customs and Border Protection ("CBP") Agency.  6 U.S.C. § 211(a).  CBP protects "the nation's borders and facilitat[es] international travel and trade."  *Stats and Summaries*, U.S. Customs & Border Protection (Nov. 19, 2024), https://www.cbp.gov/newsroom/stats; *see also* 6 U.S.C. § 211(c).  It operates as the front line of border management, addressing a wide range of challenges associated with border security, immigration, and public health.  Each year, CBP detains over one million individuals, most of whom cross the Southern Border.  Tab 9 at AR388.

Migrants often endure arduous journeys through harsh conditions "that adversely affect their health and well-being and pose medical and public health concerns upon apprehension and processing."  *Id.*  As part of its mission, CBP ensures that individuals in custody receive necessary medical treatment tailored to the high-pressure, "front-line operational environment." *Id.*  This procurement is for the medical providers needed to provide this care.

## B.    The Procurement

This procurement aims to meet CBP's medical support requirements and enhance CBP's capacity to respond effectively to the growing demands of border management, primarily at the Southern Border.  Tab 6 at AR349.  The successful bidder must provide a comprehensive suite of medical services.  Tab 2 at AR322; *see also* Tab 93.d at AR8084.  For example, it must conduct "health intake interviews, medical assessments, . . . referral coordination, follow-up care, medication management, enhanced medical monitoring, public health/infectious disease support, [and] medical summaries."  Tab 2 at AR322.  And the successful bidder must have operational flexibility, a necessity that became evident "during the 2014 influx of Unaccompanied Children." *Id.*

Loyal Source Government Services, LLC ("Loyal Source") won the predecessor contract in 2015.  *See* Tab 6 at AR350.  During the first years of the contract, CBP only needed medical support at three sites for eight hours per day.  *Id.* at AR349.  But as migration flows surged, so did the demand for medical services.  By "FY 21, CBP saw migrants entering the country at an unprecedented number of sites."  *Id.*  This resulted in an increase in the number of CBP sites requiring medical support services to over seventy, with an estimated expansion to more than ninety-four sites through FY 27.  *Id.*  And these sites required staffing twenty-four hours per day, seven days per week—or 24/7/365.

Its experience with the changing needs at the border and how it was able to adapt under the prior contract taught CBP that the flexibility "to expand services in new and existing locations" was essential as operational needs evolved.  *Id.* at AR351.  Accordingly, the work under the new contract would be "dynamic in nature, requiring a solution . . . flexible enough to meet the mission, adjust to changes in policy, allow CBP to add/delete sites, and adjust to changes in operational circumstances."  *Id.*  Finally, the new procurement sought to allow "the Government to practice adequate oversight of the contract via specific deliverables and tracking."  *Id.*

To replace the soon-expiring contract, CBP issued Solicitation No. 70B03C22Q00000081 ("the Solicitation") on July 8, 2022.  *See* Tab 22.  The award would be issued on a "best value" basis, and the procurement was split into two phases.  Tab 20 at AR501. In Phase I, CBP would evaluate bidders' staffing plans and corporate experience.  *Id.* at AR501– 02.  In Phase II, CBP would evaluate bidders' technical approaches and capabilities, past performance, and price.  *Id.* at AR502.

Vighter, LLC won the initial award in September 2022.  Tab 97 at AR8201.  Loyal Source and other bidders protested the award, resulting in CBP taking corrective action.  *Id.* CBP has amended the Solicitation several times since.  *Id.*  CBP has completed the Phase I evaluation.  Tab 63 at AR6010.  Phase II is currently underway, and no new award has been made.  Loyal Source remains the incumbent contractor.  Since September 2022, it has performed under a series of sole source bridge contracts.  Tab 6 at AR350.

### C.    Disclosures of Information

Loyal Source points to three disclosures that "violated or potentially violated the" Procurement Integrity Act ("PIA").[2]  ECF No. 37 at 1.  The first comes from a *Washington Post* article.  The second two are letters from the Government Accountability Project ("GAP") to Congress (which also led to significant press coverage).

On November 19, 2023, the *Washington Post* published an article titled "Medical provider vying for border contract faces scrutiny after girl's death."  Tab 53 at AR5703–06.  The article details information regarding the pending procurement and includes assertions of Loyal Source's performance struggles as incumbent.  *Id.* at AR5703.  CBP officials disclosed the information, which included information about CBP's Phase I evaluation of Loyal Source's proposal.  *Id*.

Loyal Source timely notified the supervisory contracting officer at CBP of the potential PIA violation on November 28, 2023.  *Id.* at AR5708.  CBP quickly concluded that a PIA violation occurred based on reviewing the *Washington Post* article, which plainly included disclosure of evaluations.  CBP's Deputy Head of Contracting Activity, on behalf of the Head of Contracting Activity ("HCA"), promptly requested that the "DHS [Office of the Chief Procurement Officer ("OCPO")] handle the competition going forward."  Tab 58 at AR5751. DHS's Chief Procurement Officer approved the transfer request.  Tab 59 at AR5753.  DHS then took further steps to maintain procurement integrity, including removing all CBP personnel from the procurement, and vetting officials continuing to work on the procurement.  *See generally* Tabs 50–52, 60, 62.[3]

The two other alleged PIA violations stem from letters that GAP sent to Congress on behalf of Troy Hendrickson (the former contracting officer's representative) and other unnamed CBP employees.  GAP sent the first letter on November 30, 2023.  Tab 76.b at AR7343–63.

---

[2] Loyal Source points to a fourth disclosure but does not argue that it amounted to a PIA violation, just that it was improper.  ECF No. 37 at 6.

[3] These steps are addressed in detail below.

3

Loyal Source timely notified Donna McMullen, then-supervisory contracting officer, of a potential PIA violation in the first letter. *Id.* at AR7400–02. GAP sent the second letter on February 16, 2024. *Id.* at AR7310–42. Loyal Source notified Gregory Blaszko, the new contracting officer, of a potential PIA violation in the second letter. *Id.* at AR8226–30. CBP admits that it did not determine whether the letters amounted to PIA violations because "CBP had already taken the maximum mitigation step, making any failure to consider" whether they violated the PIA "non-prejudicial." ECF No. 46 at 9; *see also* ECF No. 39 at 5.

### D.      Loyal Source's GAO Protest

Loyal Source protested before the Government Accountability Office ("GAO") in March 2024 based on similar allegations to those it raised here.[4] *See* Tab 76.a; Tab 97 at AR8204–11. It argued that CBP's actions prejudiced the company by failing to sufficiently mitigate PIA violations. Tab 76.a at AR6636. It also criticized CBP for not considering whether the GAP letters violated the PIA. *Id.* at AR6639–40. Loyal Source requested that CBP either cancel the Solicitation "or, at a minimum, conduct a reasonable investigation, including identifying and removing the individuals within CBP who are biased against Loyal Source." Tab 97 at AR8209 (internal quotation marks omitted). The GAO disagreed. It found that the Government took adequate mitigation measures under the Federal Acquisition Regulation ("FAR") and reasonably reduced prejudice. *Id.* at AR8208.

Loyal Source then filed its protest in this court. ECF No. 1.

## II.      Standard of Review

This court has jurisdiction over a pre-award bid protest under 28 U.S.C. § 1491(b)(1). It applies a limited and deferential scope of review in bid protest actions. The question for the court is whether the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013) (citing 28 U.S.C. § 1491(b)(4)'s adoption of the standard in 5 U.S.C. § 706).

"The court's task is to determine whether (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Id.* (internal quotation marks omitted) (quoting *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010)). It is not to determine whether there is a better or "'more correct' way" to perform the underlying action. *IAP World Servs., Inc. v. United States*, 153 Fed. Cl. 564, 567 (2021). So long as there is a "reasonable basis for [an] agency's action, the [C]ourt should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Perspecta Enter. Sols. LLC v. United States*, 151 Fed. Cl. 772, 780 (2020) (alterations in original) (internal quotation marks omitted) (quoting *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989)). "[T]he disappointed bidder bears [the] heavy burden

---

[4] Before the GAO, Loyal Source also alleged certain organizational conflicts of interest that it has not raised before this court.

of showing that the [] decision had no rational basis." *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011) (internal quotation marks omitted) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)).

Finally, the protester must, in addition to error, show that the error caused prejudice— there is no presumption. *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996); *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 997–98 (Fed. Cir. 2021). To establish prejudice in a pre-award protest, Loyal Source must show it suffered "a non-trivial competitive injury which can be addressed by judicial relief." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362–63 (Fed. Cir. 2009) (internal quotation marks omitted).

## III. Discussion

### A. Motion for Judgment on the Administrative Record

Like its protest before the GAO, Loyal Source challenges CBP's responses to the *Washington Post* article and two letters to Congress. The court first reviews the PIA framework that applies to Loyal Source's claims, and then reviews each alleged violation. It then turns to Loyal Source's motion to complete or supplement the record.

#### 1. An agency must take certain steps when evaluating an actual or alleged violation of the PIA.

Congress enacted the PIA in the aftermath of Operation Ill Wind, which exposed corruption in the procurement process. *See, e.g.*, *Clean Team Janitorial Serv., Inc. v. United States*, 171 Fed. Cl. 1, 8 (2024) (citing Pub. L. No. 100-679, § 6(a), 102 Stat. 4063 (1988)). The PIA bars federal government officials from "knowingly disclos[ing] contractor bid or proposal information or source selection information before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 2102(a)(1). Contractor bid or proposal information is non-public "information submitted to a Federal agency as part of or in connection with a bid or proposal to enter into a Federal agency procurement contract," like cost or pricing data or proprietary information. FAR 3.104-1.[5] As relevant here, source selection information includes "[r]eports and evaluations of source selection panels, boards, or advisory councils." 41 U.S.C. § 2101(7)(I).

The FAR provisions implementing the PIA set forth actions an agency must take upon receiving notice of a potential PIA violation. First, the contracting officer "must determine if the reported violation . . . has any impact on the pending award or selection of the contractor." FAR 3.104-7(a). If there is no impact, the contracting officer "must forward the information concerning the violation or possible violation and documentation supporting [the] determination . . . to an individual designated in accordance with agency procedures." *Id.* 3.104-7(a)(1). And "if that individual concurs, the contracting officer may proceed with the procurement." *Id.* 3.104-7(a)(1)(i). But if the individual disagrees, he or she "must promptly forward the

---

[5] The court cites to the Federal Acquisition Regulations as the "FAR." All FAR sections are contained in Title 48 of the Code of Federal Regulations.

information and documentation to the HCA and advise the contracting officer to withhold award." *Id.* 3.104-7(a)(1)(ii).

If there is an impact on the procurement, "the contracting officer must promptly forward the information to the HCA." *Id.* 3.104-7(a)(2). The FAR requires the HCA "review all information available and, in accordance with agency procedures, take appropriate action." *Id.* 3.104-7(b). The regulation provides a suggested, non-exhaustive list of appropriate actions. For example, the HCA might:

- Advise the contracting officer to continue with the procurement;

- Begin an investigation;

- Refer the information disclosed to appropriate criminal investigative agencies;

- Conclude that a violation occurred; or

- Recommend that the agency head determine that the contractor, or someone acting for the contractor, has engaged in conduct constituting an offense punishable under [the PIA], for the purpose of voiding or rescinding the contract.

*Id.*

Or the HCA might do any combination of these—or none of them. None is necessary or sufficient; the statute "defers to the procuring agency to take appropriate action." *Clean Team*, 171 Fed. Cl. at 8; *see also SAGAM Securite Senegal v. United States*, 154 Fed. Cl. 653, 668 (2021) (explaining that "a contracting officer has broad authority to protect the integrity of the procurement process"), *aff'd*, No. 2021-2279, 2023 WL 6632915 (Fed. Cir. Oct. 12, 2023). But what he or she decides to do must be reasonable, as this court reviews the action under the arbitrary and capricious standard. *See PAI Corp. v. United States*, 614 F.3d 1347, 1352–53 (Fed. Cir. 2010); *see also Clean Team*, 171 Fed. Cl. at 10.

Finally, if the HCA concludes that a PIA violation occurred, he or she may direct the contracting officer to "[c]ancel the procurement[,] [d]isqualify an offeror[,] or [t]ake any other appropriate actions in the interests of the Government." FAR 3.104-7(d).

      2.   <u>CBP rationally responded to the disclosure of source selection information in the *Washington Post*.</u>

Loyal Source points to three paragraphs in the *Washington Post* article that it believes violated the PIA, quoted as follows:

- Loyal Source Government Services is among a half-dozen companies under consideration for the five-year contract to

provide medical screening and services for the thousands of migrants detained each day along the southern border, according to three U.S. Customs and Border Protection officials and records obtained by [the *Washington Post*].

- Loyal Source was added last month to the shortlist of companies vying for the new contract. A CBP advisory board did not recommend Loyal Source for the next round of consideration, but the agency's procurement office overruled the board's findings, according to the three CBP officials, who spoke on the condition of anonymity because they are prohibited from discussing the source selection process.

- The contract selection was structured in a way that a company's past performance could not be considered as a factor during the first phase, but it will become a part of the process in the second phase, the officials said.[6]

ECF No. 37 at 6; Tab 53 at AR5703–05.

Soon after the *Washington Post* published its story, Loyal Source emailed the then-contracting officer, Donna McMullen, providing notice of the potential PIA violation. Tab 53 at AR5709. CBP moved quickly to address the PIA violation. Loyal Source, however, complains that the Government failed to conduct an adequate investigation into the PIA leak because all the HCA did was read the article, review Loyal Source's notice regarding the article, and review an email from counsel. ECF No. 44 at 4–6; *see also* ECF No. 37 at 15. But Loyal Source mistakes swift action for a lack of action.

Recall that Loyal Source emailed CBP on November 28, 2023, about the possible violation. CBP then took the following steps:

- On November 29, 2023, CBP's Deputy HCA contacted DHS and CBP's Office of Professional Responsibility to alert them of the possible PIA violation. The initial email stated that a PIA violation occurred. That email also "formally asked [the Office of Professional Responsibility ("OPR")] to investigate to see which CBP employees engaged in sharing information with the reporter." These actions were taken to "work on a

---

[6] Loyal Source, in the notice to the contracting officer, asserted that this paragraph violated the PIA, but it does not make this argument to this court. *Compare* Tab 53 at AR5709, *with* ECF No. 37 at 6. It is also not clear that this paragraph contains any source selection information (as defined in the PIA). The Solicitation, which has been public at all relevant times, states explicitly that CBP would consider past performance in Phase II rather than Phase I. Tab 20 at AR502.

path forward to protect the integrity of the procurement." *See* Tab 56 at AR5744–45.

- On November 30, 2023, the CBP HCA and OCPO reviewed four options to mitigate the violation. They decided that "the most appropriate remedy . . . [was to h]ave DHS or another component do the acquisition [and] provide the [technical evaluation] and procurement team." In their view, taking this course of action "would address the PIA violation completely," notwithstanding that it "would put the [Fiscal Year 2022 funding] at the highest risk." *See* Tab 57 at AR5747.

- On December 1, 2023, CBP emailed DHS, confirming that "the HCA believes [it is] in the best interest of the government . . . to request the DHS OCPO handle the competition going forward." This would "mitigate the negative impact of the [PIA] violation." CBP also indicated that it would prepare an official memorandum to request the switch. *See* Tab 58 at AR5751.

On December 11, 2023, CBP's HCA issued a formal memorandum in which she "(1) [a]dvised the contracting officer to pause the procurement; (2) [r]eferred the matter to the Office of Professional Responsibility; and (3) [c]oncluded that a [PIA] violation occurred." Tab 59 at AR5752. Next, because of the PIA violation, she:

> determined it is in the best interest of the Government for the medical services procurement to be transferred to the DHS Office of the Chief Procurement Officer to manage the source selection phase and award the new contract. The transfer will protect the integrity of the continuing procurement action and ensure[] that this essential procurement moves forward while the investigation into the violation and misconduct of CBP personnel is underway.

*Id.* at AR5753; *see also* Tab 62 at AR6008 (reiterating that the goal of the transfer was "to protect the integrity of the continuing procurement action and to ensure that this essential procurement moves forward while the investigation into the potential violation and misconduct of CBP personnel is formally conducted by OPR"). Accordingly, she "request[ed] approval to temporarily transfer the . . . procurement to" DHS to manage. Tab 59 at AR5753. DHS approved the request. *Id.*

OCPO assigned Gregory Blaszko to be the new contracting officer. Tab 49 at AR5255–56. He issued several amendments to the Solicitation and requested new proposals. *See* Tabs 50–52. Importantly, he named a new evaluation team. Tab 62 at AR6008. Though the initial replacement team contained a CBP employee as a non-voting technical advisor, that individual was removed after a second round of vetting that Mr. Blaszko conducted of all evaluation team

members. *Id.* at AR6008–09.[7]  Ultimately, Mr. Blaszko concluded that he was "confident that each member . . . will be fair and impartial" and "that no member of the reconstituted evaluation team could have disclosed information to the Washington Post in violation of the [PIA]." Tab 72 at AR6537.  In the end, the evaluation team does not contain anyone from CBP, "or anyone involved in the evaluation team while the procurement was at CBP." ECF No. 40 at 16 (emphasis omitted) (comparing Tab 73 at AR6540 with Tab 10 at AR433).

For starters, Loyal Source believes that the investigation was "perfunctory and narrowly circumscribed." ECF No. 44 at 5.  But an investigation need only go so far as needed to determine whether a violation occurred.  Here, the violation was clear upon reading the *Washington Post* article: Agency proposal evaluations in an ongoing procurement were disclosed publicly.  There was no need to dig deeper.  As the Federal Circuit has explained, "[i]nvestigations are dynamic[, a] decision as to what actions to take next is often influenced by what has been learned so far." *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1381 (Fed. Cir. 2024).  CBP learned that its officials disclosed source selection information by reading the article.  It then read Loyal Source's notice and sought legal advice, concluding that a PIA violation occurred.  That is enough.

Consider an example.  Suppose that the *New York Times* published an article on its front page that included an offeror's price proposal.  Little investigation is necessary to figure out that a PIA violation occurred.  It is inconceivable that the court would require further investigation into *whether* a violation occurred—it would be apparent on the front page of the newspaper (assuming, of course, that the offeror did not provide the information itself).  The same is true here.

What is more, the Federal Circuit recently clarified the "twin layers of deference" owed "to the agency's investigative process." *Oak Grove Techs.*, 116 F.4th at 1380.  That deference stems from the discretion Congress vested in the agency and the "'strong presumption' that governments officials . . . act consistent with their duties." *Id.* (quoting *Sanders v. U.S. Postal Serv.*, 801 F.2d 1328, 1331 (Fed. Cir. 1986)).  So long as an investigation is rational, this court must uphold the agency's action.  And the CBP's decision-making here met this standard.

Upon learning of the PIA violation, CBP took quick and decisive action, as detailed above.  It told the contracting officer to pause the procurement.  It referred the matter to OPR, showing how seriously it took the procurement integrity concerns (the OPR investigation remains ongoing).  It transferred the procurement completely out of CBP and into DHS OCPO "to [further] protect the integrity of the continuing procurement action." Tab 59 at AR5752–53. All the while, it ensured that "investigation into the violation and misconduct of CBP personnel" continued.  *Id.*  And DHS provided fresh troops.  It named a new contracting officer, who issued new amendments and requested new proposals, and then named a new evaluation team that did not include anyone from CBP—only after vetting the potential members twice.  DHS and CBP took these actions out of the utmost caution.  Perhaps more would be necessary if the DHS

---

[7] To be clear, there is no indication that this CBP employee had anything to do with the disclosure of PIA covered materials.  The contracting officer appears simply to have been removing all CBP employees from any role in the procurement going forward.

wanted to leave the procurement with CBP to ensure that those on the evaluation team were not involved in the PIA violations. But that is not the case before the court. Here, DHS removed CBP from the procurement entirely and then vetted the new evaluation team from OCPO to ensure they were not involved with or tainted by the PIA violation. This court has no basis to say that is not sufficient to allow the procurement to move forward.

Loyal Source erroneously points to *SAGAM Securite Senegal* in support. ECF No. 37 at 16 (citing *SAGAM Securite Senegal*, 154 Fed. Cl. at 670). First, it argues that CBP did not "take appropriate action" because it took "an ostrich-like stance and refuse[d] to reasonably address the taint caused" by the improper disclosures. ECF No. 37 at 16 (internal quotation marks omitted) (quoting *SAGAM Securite Senegal*, 154 Fed. Cl. at 670). And second, that "'any reasonable corrective action was required to address, in some substantive way,' the harm that an offeror suffered as a result of a PIA violation." *Id.* at 22 (quoting *SAGAM Securite Senegal*, 154 Fed. Cl. at 667).

But the facts in *SAGAM Securite Senegal* are quite different from the facts here. There, the Department of State ("State") issued a solicitation for guard services. *SAGAM Securite Senegal*, 154 Fed. Cl. at 658–59. SAGAM (the incumbent), Torres-SAS Security LLC Joint Venture ("Torres"), and one other offeror submitted proposals. *Id.* at 659. State disqualified the third offeror and awarded the procurement to Torres. *Id.* State, while taking corrective action, learned that the contracting officer violated the PIA by disclosing SAGAM's cost and bid information to Torres. *Id.* That information "induced Torres to make material price proposal changes." *SAGAM Securite Senegal v. United States*, No. 2021-2279, 2023 WL 6632915, at *2 (Fed. Cir. Oct. 12, 2023) (internal quotation marks omitted). State then determined the error warranted cancellation and resolicitation. *SAGAM Securite Senegal*, 154 Fed. Cl. at 665. Those steps, however, did not "restore fairness to th[e] procurement" or "reasonably address the CO's inequitable conduct." *Id.* at 665, 669. In other words, they lacked a rational basis because those steps "merely perpetuate[d] the agency's procurement error so that Torres" could benefit. *Id.* at 664; *SAGAM Securite Senegal*, 2023 WL 6632915, at *6 (explaining that a redo "c[ould not] erase the knowledge that Torres now ha[d] regarding how to comply with solicitation requirements"). This court imposed the harsh remedy of disqualifying Torres and directing award to SAGAM, a decision that was upheld on appeal. *SAGAM Securite Senegal*, 154 Fed. Cl. at 675; *SAGAM Securite Senegal*, 2023 WL 6632915, at *11.

Loyal Source's first contention that CBP "took an ostrich-like stance" and "refuse[d] to reasonably address the taint caused" by the improper disclosures fails because the argument mistakes decisive action for inaction. But DHS acted thoroughly and decisively. It transferred the procurement completely to DHS OCPO and removed anyone from CBP from the procurement. DHS appointed a new contracting officer who amended the Solicitation and received updated proposals. And the new contracting officer vetted everyone working on the procurement going forward twice to ensure that they were not involved with or tainted by the disclosure. This action reasonably neutralized potential taint, unlike State's actions in *SAGAM Securite Senegal*.

Loyal Source's second contention that DHS failed to reasonably remove the taint of the PIA violation fails for two reasons. First, Loyal Source omits the second clause in the sentence from *SAGAM Securite Senegal*. In relevant part, the sentence reads, "[A]ny reasonable

10

corrective action was required to address, in some substantive way, the fact that Torres now possesses competition-sensitive information that it has no right to possess." *SAGAM Securite Senegal*, 154 Fed. Cl. at 667. In *SAGAM*, the competitor had SAGAM's pricing data. Here, there is no competitor that "possesses competition-sensitive information." Loyal Source frames the sentence as requiring that corrective action must "substantive[ly]" address "the harm that an offeror suffered as a result of a PIA violation." ECF No. 37 at 22. Even so, the problem that Loyal Source runs into is that it has not shown any harm, nor has it shown how the transfer was insufficient to remedy any harm.

Loyal Source next argues that a "reasonable investigation . . . would have included, at a minimum, a document review and interviews with relevant CBP employees." ECF No. 37 at 16. It also says that review of the article should have made CBP ask more questions, like:

> []who are the three CBP officials leaking source-selection information to the *Washington Post*; [] why are the three CBP officials publicly disparaging an offeror in an active procurement; [] are the three CBP officials biased against Loyal Source and have they, or other CBP employees, taken other improper actions against Loyal Source; and [] are Agency employees intending to use the false and misleading allegations in the article as a basis for downgrading Loyal Source's past performance under the Solicitation.

ECF No. 44 at 5. But neither Loyal Source nor this court determines what the best response is for an agency to take. *See Oak Grove Techs.*, 116 F.4th at 1380 (emphasizing that a court may not "substitute[] its own judgment as to what constitutes an adequate investigation"). Indeed, it would be improper for this court to order DHS and/or CBP to interview individuals as part of the *procurement* in this case.[8]

To be sure, the Government did not make the required impact determination, as required by the statute. But, again, by taking the steps it did, it ensured that the disclosures would have no impact on the procurement. Its actions erase Loyal Source's concern that CBP was "not in a position to make a reasonable determination regarding the effect that the violations had on the procurement." ECF No. 37 at 17. Furthermore, if CBP did make a positive impact determination, it would have been required to send the issue to the HCA for her determination. That much happened here—the contracting officer sent the matter to the HCA, and she made the determination that transfer to OCPO was appropriate. Even though CBP missed a step along the way, it reached the same endpoint on the PIA's review path. Thus, the failure to make an impact determination in this circumstance was harmless error.

Loyal Source remains concerned about potential bias at CBP, and in doing so, conflates its bias allegations and its PIA allegations. But they are distinct. The PIA does not require an

---

[8] The court is cognizant of the fact that the only thing before it is the procurement, not the ongoing OPR investigation or any other investigation regarding the PIA violation. Nothing in this opinion opines on the propriety of any conduct in those investigations.

inquiry into potential bias. It requires an inquiry into the potential or actual PIA violation, and bias alone is not a violation of the PIA. *See* FAR 3.104-7. In any event, the removal of CBP from any further involvement in the procurement coupled with the new contracting officer's vetting of everyone working on the procurement going forward (twice) ensure that Phase II will not be tainted by any CBP bias or previous PIA violation. Again, CBP is not involved, and there are no allegations of any bias, PIA violation, or taint of the DHS OCPO personnel now conducting Phase II of the procurement. The conclusions that the procurement will no longer be tainted by the PIA violations or by bias need only be rational. *See Honeywell, Inc.*, 870 F.2d at 648. And again, DHS and CBP's actions easily met that standard.

Finally, Loyal Source makes a series of failing arguments regarding the mitigation efforts, contending that they fail to address "the misperception within [CBP] regarding Loyal Source's performance and capabilities, the animosity that [CBP] employees have towards Loyal Source, the [harmful] manipulation of performance ratings by [CBP] employees . . . , and . . . the pressure that" CBP is under to not award the Solicitation to Loyal Source. ECF No. 44 at 9. In other words, Loyal Source argues that "transferring the procurement does not adequately mitigate the harm to Loyal Source and to the procurement." *Id.* at 8 (cleaned up). First, neither perceptions nor misperceptions about Loyal Source's performance are PIA violations. 41 U.S.C. § 2102(a). Second, CBP is neither awarding the contract nor involved in the evaluation any way, meaning that whatever bias that may exist within CBP is no longer part of this procurement.

For the moment, disregard the prior discussion about CBP's response. Suppose CBP in fact acted irrationally. Loyal Source still cannot prove prejudice, which is "always required." *Sys. Stud. & Simulation*, 22 F.4th at 997–98. It "has not shown how [the] disclosures conveyed an unfair advantage to other vendors" or how it has been "competitively prejudiced." Tab 97 at AR8211. Nor has Loyal Source alleged "any bias on the part of DHS personnel, or argue[d] that the newly appointed DHS contracting officer, evaluation team, or source selection official have violated the PIA." *Id.* Loyal Source says that there exists the "potential to influence members of the evaluation team who . . . may be unwilling to favorably evaluate" it. ECF No. 44 at 20. That argument invites the court to give weight to speculation about events that have not happened yet. The court declines the invitation. Should Loyal Source identify any such conduct during the evaluation once it happens, it remains free to file a post-award protest on that issue. But in the present protest, Loyal Source's claims based on the *Washington Post* article fail.

       3.    <u>Letters to Congress</u>[9]

The court now turns to the letters to Congress. Loyal Source faults CBP for not considering whether the letters violated the PIA, arguing that the letters contained false statements and "confirmed a bias against Loyal Source within CBP and the Office of the Chief

---

[9] Loyal Source also argues that CBP did not comply with FAR Part I "because it has not taken actions to reasonably address the harm that CBP officials brought upon Loyal Source through the public disclosures and to ensure that Loyal Source is afforded an opportunity to compete on a level playing field under the Solicitation." ECF No. 37 at 25. The court understands these claims to relate to the bias allegations and considers the bias issues in this section.

Medical Officer ("OCMO")."  ECF No. 37 at 7.  The court reviews the letters and then considers Loyal Source's claims.

<em>a)    First Letter to Congress</em>

GAP sent the first letter to Congress that Loyal Source complains violated the PIA on November 30, 2023.  Tab 76.b at AR7344–63.  The letter alleges some performance failures by Loyal Source, such as severe understaffing, employment of medical providers without proper clearances or licenses, and improper billing practices.  *See id.*  It also argues that the CBP's Office of Acquisition failed to hold Loyal Source accountable and retaliated against Mr. Hendrickson (the discloser of information) for raising these concerns.  *Id.*

Loyal Source notified the supervisory contracting officer of the letter via email on December 14, 2023.  *Id.* at AR7400–02.  The email complains that the letter "underscore[s] the concerns Loyal Source has previously raised related to the integrity of the procurement process" and "reflects Mr. Hendrickson's and OCMO's determination to have Loyal Source replaced on the follow-on contract."  *Id.* at AR7400–01.  But Loyal Source does not point to specific language that violates the PIA, even though it argues that the letter "confirm[s an] additional violation[]."  ECF No. 37 at 19.  Instead, most of its allegations relate to bias.  *See* Tab 76.b at AR7400 (arguing that the letter "confirms an improper bias against Loyal Source and continues to advance the false narrative that Loyal Source did not meet material contractual requirements" and "confirms a strong bias against Loyal Source and targeted efforts by CBP personnel to circumvent the proper procurement process so that Loyal Source does not receive the award").  The language from the letter cited in the email is limited:

- Mr. Hendrickson was responsible for leading preparations for the new five-year medical services contract recompete.

- [Messages from Mr. Hendrickson to OCMO and the contracting officers]: As you know, there is much negative history with the current Loyal Source contract, years of neglect, open investigations, privacy breach, invoicing issues, etc.  We desire a fresh start with both CO and CS for the new contract.[10]

*Id.* at AR7400–02.

Before this court, Loyal Source points to the following portions of the letter as violating the PIA:

- We highlight . . . serious failures by Loyal Source Government Services to comply with the terms of its $421 million Medical Services Contract to provide medical care to noncitizens at the

---

[10] This quoted language might lend support to Loyal Source's bias argument—not a PIA argument.  Tab 76.b at AR7400–02.

13

southern U.S. border, with shocking deficiencies both in the administration of the contract and the provision of medical care.

- The new CPARS [Contract Performance Assessment Rating System] that the team of twelve OCMO personnel, including Mr. Hendrickson, drafted for the [period of performance] of September 30, 2020-September 29, 2021 lowered Loyal Source's ratings from "exceptional" to "unsatisfactory" and "marginal" with a recommendation against consideration of Loyal Source for future similar contracts.

- Mr. Hendrickson also made explicit that the CPARS he and OCMO created should be expected to be a record for a potential GAO protest, audits, and OPR . . . investigations.

- There was a tension between OA's [CBP Office of Acquisition] focus on the plain language of the Scope of Work and conservative readings of the FAR and Dr. Tarantino's vision, based on his years of medical experience, about the level of contractor performance required to meet OCMO's mandate of safe and ethical medical service delivery.

ECF No. 37 at 7 (internal quotation marks and citations omitted).

One of the key takeaways from the November 30 letter is that Mr. Hendrickson is the ringleader of an anti-Loyal Source faction at CBP. Mr. Hendrickson served as the former contracting officer's representative under the incumbent contract. He was removed before the original solicitation for the recompete was issued, and "has never served on the evaluation team for the recompete procurement, either at CBP or now at DHS." ECF No. 40 at 21.

> b)    *Second Letter to Congress*

The second letter to Congress that Loyal Source complains violated the PIA was sent on February 16, 2024. Tab 76.b at AR7311–42. The letter, from multiple whistleblowers (including Mr. Hendrickson), contains many of the same factual allegations as the first letter. *Compare id.* at AR7355, *with id.* at AR7312. It alleges underperformance, mismanagement, and fraud, ultimately urging Congress to address Loyal Source's purported failures. *Id.* at AR7311– 12.

Loyal Source attempted to email the new contracting officer on February 27, 2024, notifying him about the letter to Congress, but incorrectly typed Mr. Blaszko's email address. ECF No. 1-10 at 1. Loyal Source included the email in its March 4, 2024, GAO protest, and resent the email to Mr. Blaszko on March 6, 2024. Tab 79.a at AR7478.

Like the notice regarding the first letter, the second notice repeats bias allegations. Tab 76.b at AR8227 (complaining that the second letter "confirm[s] that issues related to

14

procurement integrity, bias, and organizational conflicts of interest[11] continue to pose challenges to the on-going procurement under" the Solicitation and that "Loyal Source has been the subject of targeted, inaccurate communications to [Congress] . . . [in] several articles"). The notice states that the ultimate goal of the letters is "to manipulate and undermine public perception of Loyal Source's performance under the current contract . . . and to pressure and influence decisionmakers in the open procurement for the follow-on contract," and it also argues that the letters and articles "evidence the dissemination of sensitive information about CBP's source selection methodology and Phase I evaluation under the on-going Re-compete in violation of the [PIA] and other antifraud laws and regulations." *Id.* Regarding the disclosure of sensitive information that could possibly violate the PIA, Loyal Source only cited to the November 19, 2023 *Washington Post* article—not to either letter to Congress. *Id.* Regarding specific language from the February 16 letter to Congress, Loyal Source only pointed to language discussing "staffing shortages, delays in background checks, contractors working without proper clearance, failure to use the Electronic Medical Records system." *Id.* at AR8228 (internal quotation marks omitted). It then cited to positive performance ratings under the contract. *Id.*

And to the court, Loyal Source alleges that the language in the letter contains "false statements, as well as statements reflecting an animus within [CBP] towards Loyal Source":

- These disclosures in their entirety alarmingly evidence ongoing failures by CBP Leadership and the CBP Office of Acquisition to hold Loyal Source accountable despite this contractor's record of performance deficiencies.

- All of these whistleblowers have attempted to use regular internal channels to share their concerns; all have been met with resistance. . . . Yet, they find it critical that Congress and oversight entities take swift action . . . and they feel an imperative duty to inform Congress and oversight bodies of current wrongdoing.

- Following [an 8-year-old's death while in CBP custody] the Department of Homeland Security scapegoated OCMO and its Chief Medical Officer, Dr. David Tarantino, despite evidence that Loyal Source was to blame for the death. . . . Loyal Source and the CBP Office of Acquisition have yet to be held to account; in fact, Loyal Source has remained the vendor on the Medical Services Contract.

- [W]e share these protected whistleblower disclosures . . . and request the following: . . . Conduct thorough and prompt

---

[11] Loyal Source alleged that a competitor had an organizational conflict of interest ("OCI") in its GAO protest. Tab 76.a at AR6608. The GAO dismissed that allegation as unripe because of an ongoing OCI investigation. Tab 84 at AR7490. Loyal Source does not allege an OCI in its complaint.

> oversight into the procurement process to select a vendor for
> the CBP Medical Services' Contract recompete, which was
> awarded to Vighter in 2022, though the contract transfer has
> been delayed since that date, resulting in Loyal Source
> continuing to earn hundreds of millions of taxpayer dollars
> despite a record of dangerous substandard performance.

ECF No. 37 at 8 (internal quotation marks and citations omitted).  Loyal Source also points out
that the letter indicates that the OCMO "had a 'key role' in the 'recompete process, including
serving on the Technical Evaluation Team, where his understanding of Loyal Source's shortfalls
was reinforced in significant detail through extensive past performance review and discussion,
and the ultimate award of the contract to a different vendor.'"  *Id.* at 19.

c)    <em>DHS rationally responded to the two letters.</em>

At the outset, Loyal Source argues that it should receive a presumption of prejudice because
CBP did not investigate whether either of the letters violated the PIA.  *Id.* at 23.  But the
court does not presume prejudice.  *Sys. Stud. & Simulation*, 22 F.4th at 997–98.  Thus, prejudice
is still a hurdle Loyal Source must clear—and it cannot.

Loyal Source's notices regarding each letter arrived after DHS moved the procurement
from CBP to DHS OCPO.  OCPO moved the procurement on December 11, 2023.  Loyal Source
sent its notice regarding the first letter on December 14, 2023, and its notice regarding the second
letter on March 6, 2024.[12]  Loyal Source still has not identified any prejudice flowing from a PIA

---

[12] The Government says that the court should disregard the arguments regarding the second letter
because Loyal Source did not promptly notify the contracting officer.  When protesting a PIA
violation:

> A person may not file a protest against the award or proposed
> award of a Federal agency procurement contract alleging a
> violation of [the PIA], and the Comptroller General may not
> consider that allegation in deciding a protest, unless the person, no
> later than 14 days after the person first discovered the possible
> violation, reported to the Federal agency responsible for the
> procurement the information that the person believed constitutes
> evidence of the offense.

41 U.S.C. § 2106.  Loyal Source attempted to send its letter to Mr. Blaszko on February 27, 2024
(11 days after the second letter to Congress), but the letter never arrived because Loyal Source
incorrectly typed the contracting officer's email address.  ECF No. 1-10 at 1.  Loyal Source then
"included its letter as an attachment to its March 4, 2024 [17 days later] protest at the GAO and
resent the letter to the contracting officer via email on March 6, 2024 [19 days later]."  ECF No.
44 at 13 (internal citation omitted).

The members of this court have not all agreed that this statutory time limit applies
to protests filed in this court or just those filed at the GAO.  Some judges have applied it
to cases here.  *See Insight Pub. Sector, Inc. v. United States*, 161 Fed. Cl. 760, 812–13

violation that the transfer of the procurement did not remedy. As discussed above, DHS has already acted to mitigate any potential harm—CBP is longer involved in this procurement at all. What is more, Loyal Source argues that the disclosures are "directly related" to the *Washington Post* disclosure. ECF No. 30 at 6–7. That argument further supports the court's conclusion that DHS has already mitigated the harm.

Loyal Source also misunderstands the PIA. It argues that the PIA requires the Agency investigate the alleged bias. ECF No. 37 at 34. But bias is not a PIA violation. *See supra* Section III.B. And the fact that CBP is no longer involved at all means there is no potential for CBP to bias the procurement. Loyal Source, however, insists that DHS must address Mr. Hendrickson's "intent to downgrade Loyal Source's" CPARS ratings. ECF No. 37 at 3. This argument fails for three reasons.

First, the record does not show "well-nigh irrefragable proof" of prejudicial bias at CBP, even if it does show bias—a point the court assumes without deciding—in Mr. Hendrickson and others. *Croman Corp. v. United States*, 724 F.3d 1357, 1364 (Fed. Cir. 2013) (internal quotation marks omitted) (quoting *Kalvar Corp. v. United States*, 543 F.2d 1298, 1301–02 (Ct. Cl. 1976)). The first letter's main complaint is that Mr. Hendrickson and his team issued poor CPARS ratings. The procurement office then upgraded those ratings to "exceptional" and "very good." Tab 76.b at AR7414–15. That does not indicate bias, it indicates a difference of opinion. The process cannot be said to prejudice Loyal Source, at least with regard to that CPARS rating.

Second, Loyal Source argues that a later poor CPARS rating of [ * * * ] prejudiced it. ECF No. 37 at 28 & n.9. But the validity of that CPARS rating is not before the undersigned; it is before Judge Bonilla. *See Loyal Source Government Services, LLC v. United States*, No. 24-1426. In any event, the record fails to show clear and convincing evidence of bias. When CBP procurement officials previously concluded a negative CPARS rating was inaccurate, they changed it—significantly. That no similar upgrade happened the second time does not provide well-nigh irrefragable proof of bias. If anything, it is more likely that the performance rating is accurate because the record demonstrates that when an unreasonably low CPARs rating was submitted, the Agency fixed it. But again, the substance of the CPARS rating is at issue in the case before Judge Bonilla, not this one.

Third, Loyal Source has not provided any basis to prospectively order the Agency to do anything regarding the CPARS issue. Filling out a CPARS evaluation is not procurement activity, it is contract administration. The question for a procurement action will be whether the past performance evaluation rationally considers the information before it. That evaluation has not happened yet. Loyal Source has not been prejudiced by any CPARS rating in this procurement because the past performance evaluation *has not happened yet*. If Loyal Source can show prejudicial error in its evaluation after it takes place, it may protest then. But there is no

---

(2022); *Melwood Horticultural Training Ctr., Inc. v. United States*, 153 Fed. Cl. 723, 742 (2021); *Omega World Travel, Inc. v. United States*, 82 Fed. Cl. 452, 467–68 (2008). Others have not. *See McKing Consulting Corp. v. United States*, 78 Fed. Cl. 715, 722 n.12 (2007). Because this case does not require the court to resolve this issue, the court does not attempt to do so.

basis to presume that DHS will not properly evaluate Loyal Source's proposal given the presumption of regularity and the vetting of the current evaluators by DHS's OPR and the contracting officer. In sum, none of Loyal Source's arguments suffices to establish a PIA or bias claim based on the letters to Congress.

### B.    Injunctive Relief

Because success on the merits is required for injunctive relief and Loyal Source has not prevailed on the merits, the court denies Loyal Source's motion for an injunction. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).

### C.    Motion to Complete and Supplement the Record

Loyal Source also moves to complete and supplement the record. ECF No. 30 at 1. The court considers each in turn.

*Motion to Complete.* Loyal Source argues that the Administrative Record is incomplete because it "does not contain all information considered by the [HCA], relevant documents within the possession of the CBP, . . . or any documents related to the letters that Troy Hendrickson, . . . and other CBP employees sent to Congress." *Id.* A motion to complete asks "the [c]ourt to order the agency to complete the record by including omitted documents that the agency did consider in making its decision." *Advanced Tech. Sys. Co. v. United States*, No. 23-1000, 2023 WL 8805707, at *3 (Fed. Cl. Oct. 4, 2023). Loyal Source points to the PIA Memorandum, where the HCA stated that she "reviewed all information available" to support that the Administrative Record is missing some of that information. ECF No. 30 at 4 (internal quotation marks and emphasis omitted) (quoting Tab 59 at AR5752).

Loyal Source seeks additional documents regarding supposed communications with OPR and the Office of Inspector General. *Id.* at 6. The Government, however, has made clear that "[t]here are no other documents to add." ECF No. 39 at 3. Everything the HCA considered and the documents that Loyal Source requests are already in the record. For example, Loyal Source requests adding the two letters to Congress and its notices to the record. ECF No. 30 at 8. But they already are there. *See* Tab 76.b at AR7311–42, AR7344–63, AR7400–02, AR8227–30. The Administrative Record includes documents from CBP and DHS. In the end, Loyal Source has not pointed to concrete evidence that additional documents should be added to the record (*e.g.*, documents that are specifically referred to in the record that are absent).

The HCA also reviewed two redacted emails from counsel. *See* ECF No. 40 at 15 (citing Tab 53). Loyal Source says that "the Government has waived any privilege that the emails may have been subject to by relying on those emails to assert that the [HCA]'s review was reasonable."[13] ECF No. 44 at 6. But stating that the HCA considered the advice does not put the

---

[13] One email identifies two attachments titled "2023.11.28 – LSGS Concerns Regarding Recent Articles.pdf" and "Washington Post article.pdf." Tab 53 at AR5700–02. The other email appears to be part of the same thread. *Id.* at AR5701. November 28, 2023 is the date Loyal

advice at issue.  All the Government is saying is that the HCA did consider the advice of counsel.  Without more, that does not vitiate the privilege.

As for the letters to Congress, "there is nothing with which to complete the record."  ECF No. 39 at 4.  At bottom, Loyal Source has not identified "reasonable, non-speculative grounds for its belief that [other] documents were considered by the agency and not included in the record."  *See Sara Lee Corp. v. Am. Bakers Ass'n*, 252 F.R.D. 31, 34 (D.D.C. 2008) (internal quotation marks omitted) (quoting *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006)).  Its motion to complete fails.

*Motion to Supplement*.  Loyal Source also requests that "if there are no additional documents reflecting the [HCA]'s review of the acknowledged PIA violations and other improprieties, . . . that the Administrative Record be supplemented with the deposition of" the HCA, Mr. Hendrickson, and "the non-privileged, relevant documents from" the OPR investigation.  ECF No. 30 at 2, 5.  "The focus of judicial review of agency action [is] the administrative record . . . ."  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009).  "Discovery is typically not available in bid protest cases . . . ."  *Rotair Aerospace Corp. v. United States*, 167 Fed. Cl. 571, 577 (2023).  That said, the record may be supplemented if the "existing record is insufficient to permit meaningful review consistent with the APA."  *Axiom Res. Mgmt.*, 564 F.3d at 1381.  "A court may order depositions . . . when 'the record [i]s inadequate to' explain a contracting officer's procurement decision," when "'required for meaningful judicial review,'" or when "serious questions as to the rationality of the procurement decision have been raised."  *Off. Depot, Inc. v. United States*, 94 Fed. Cl. 294, 296, 298 (2010) (quoting and citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1337–40 (Fed. Cir. 2001)); *Sonoran Tech. & Pro. Servs., LLC v. United States*, 132 Fed. Cl. 475, 478 (2017).  A court may "order the agency to include documents that were not considered in making its decision, but should have been."  *Advanced Tech. Sys. Co.*, 2023 WL 8805707, at *3.

Loyal Source says the HCA's testimony "is necessary for effective judicial review because it will address the reasonableness of the actions that the Agency did, and did not, take when investigating the multiple PIA violations and improprieties at issue in this procurement."[14]  ECF No. 30 at 2.  Loyal Source says Mr. Hendrickson's testimony "is necessary for effective judicial review" because the Administrative Record "does not include any documents that reflect investigative efforts or mitigation that are focused on" him, and he has "taken actions in concert with other unnamed CBP employees designed to harm Loyal Source's chances of receiving the award at issue in this protest and that reflect that certain Agency personnel are biased against Loyal Source."  *Id.*  It also argues that the testimony "would provide information on the issue of whether the temporary internal transfer of the procurement to a new contracting office is

---

Source emailed the contracting officer regarding the November 19, 2023 *Washington Post* article.  Those attachments are public record and are also in the Administrative Record.

[14] The requested testimony would be limited, Loyal Source says.  *See* ECF No. 30 at 9.

sufficient to protect the integrity of the procurement and to mitigate the harm that Loyal Source has suffered as a result of the PIA violations." *Id.* at 13.

Neither the HCA's testimony nor Mr. Hendrickson's is necessary for effective judicial review in this case. The questions for the court here are whether CBP rationally responded to the alleged PIA violations, and whether Loyal Source suffered prejudice. The record shows the steps CBP took to rectify an admitted PIA violation, and for the reasons discussed above, those actions were more than rational, and Loyal Source has not been prejudiced. As for Mr. Hendrickson, the information he has is not important because he was removed as the contracting officer's representative before the recompete of this procurement and CBP is no longer involved in any capacity. Loyal Source's claim that "Mr. Hendrickson . . . [is] in a position to influence the award decision under the follow-on procurement through ongoing oversight of Loyal Source under the incumbent contract" again confuses the PIA with other allegations Loyal Source advances. ECF No. 30 at 11–12. Further, this argument is the same one that the Federal Circuit squarely rejected in *Oak Grove Technologies*. There, the trial court admonished the agency for choosing not to interview the CEO of the awardee of the contract at issue and of two whistleblowers. *Oak Grove Techs., LLC v. United States*, 155 Fed. Cl. 84, 116 (2021), *vacated and remanded*, 116 F.4th 1364 (Fed. Cir. 2024). The Federal Circuit, in turn, admonished the trial court for "fail[ing] to acknowledge the twin layers of deference [afforded to the government] . . . [and instead] substitut[ing] its own judgment as to what constitutes an adequate investigation." *Oak Grove Techs.*, 116 F.4th at 1380.

Finally, Loyal Source says "the non-privileged, relevant documents from" the OPR investigation are necessary for effective judicial review because the "information is relevant to the improprieties raised in all three counts in Loyal Source's Complaint and should have been considered by the Agency when determining whether CBP adequately investigated and mitigated the harm to Loyal Source and protected the integrity of the procurement." ECF No. 30 at 2. And that "the record currently does not include any details as to the scope and results of the investigation conducted by CBP, including who within CBP violated the PIA and the nature and extent of the actions those individuals took against Loyal Source." *Id.* at 15. The Government is clear that the "vetting process for the operative evaluation team and source selection authority . . . did not rely on any information from OPR." ECF No. 39 at 8. Therefore, the OPR investigation is not relevant to the review of whether CBP properly responded to the alleged violations.

The ultimate question in this case is whether CBP and DHS rationally responded to the PIA violation. They did. None of the additional documents and testimony that Loyal Source seeks in its motion to supplement weigh on that question, so the motion is denied.

## IV.    Conclusion

For the foregoing reasons, the court **DENIES** the Plaintiff's Motion to Complete and Supplement the Administrative Record, ECF No. 30, **DENIES** the Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 36, **GRANTS** the Government's Cross-Motion for Judgment on the Administrative Record, ECF No. 40, and **DIRECTS** the Clerk's Office to enter judgment accordingly.

It is so ORDERED.

s/ Edward H. Meyers
Edward H. Meyers
Judge